1
2
3
4
5
6
7          **IN THE UNITED STATES DISTRICT COURT FOR THE**
8              **EASTERN DISTRICT OF CALIFORNIA**
9

10   HENRY MANSON III,                    NO. 1:07-cv-00437 -OWW-GSA-PC
                                      )
11                    Plaintiff,      )    FINDINGS AND
                                      )    RECOMMENDATIONS RE
12          v.                        )    DEFENDANT'S MOTION FOR
                                      )    SUMMARY JUDGMENT
13   DAVID SMITH,                     )
                                      )    (Doc.  45 )
14                    Defendant.      )
                                      )    OBJECTIONS DUE IN THIRTY
15   _____)    DAYS
16
17
          Plaintiff is a state prisoner proceeding pro se in this civil rights action.  The matter was
18
     referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule
19
     302.  Pending before the Court is Defendant's motion for summary judgment.  Plaintiff has
20
     opposed the motion.
21
     **I.    Procedural History**
22
          This action proceeds on the original complaint against Defendant Dr. David G. Smith on
23
     Plaintiff's claim of deliberate indifference to his serious medical needs in violation of the Eighth
24
     Amendment.   The complaint in this action was filed on March 20, 2007, naming as defendants
25
     the following individuals: David G. Smith, M.D.; Maria Schwartz, R.N.; Avinda Brar, M.D.;
26
     James Johnston, M.D.; John Klarich, M.D.   On November 18, 2008, an order was entered,
27
     finding that the complaint stated a claim as to the above defendants and directing service of
28

process of the complaint.  On March 13, 2009, Dr. Smith and Dr. Johnson appeared by motion to dismiss.  On April 15, 2009, an order was entered, dismissing Dr. Klarich.  On April 20, 2009, Dr. Brar filed an answer.   On June 19, 2009, an order was entered, dismissing Defendant Schwartz.   On December 8, 2009, findings and recommendations were entered, recommending that the motion to dismiss filed on March 13, 2009, be granted in part and denied in part.  On January 19, 2010, a motion for summary judgment was filed by Dr. Brar.   On January 27, 2010, an order was entered by the District Court, adopting the findings and recommendations regarding the motion to dismiss, dismissing Defendant Johnson and Plaintiff's state law claims from this action.  On March 3, 2010, Defendant Smith filed the motion for summary judgment that is now before the Court.   On July 12, 2010, findings and recommendations were entered, recommending that Defendant Brar's motion for summary judgment be granted.   On September 2, 2010, an order was entered by the District Court, adopting the findings and recommendations and granting Defendant Brar's motion for summary judgment.  Defendant Dr. Smith is the sole remaining defendant in this action.[1]

## II.    Allegations

On April 5, 2003, Plaintiff suffered an epileptic seizure.  After discharge from the prison hospital, Plaintiff submitted a health care request for a shoulder injury.  (Compl. ¶¶ 34, 25.)  On May 14, 2003, Plaintiff's shoulder was examined by Dr. Cantwell.  Plaintiff advised Dr. Cantwell that he injured his shoulder during his epileptic seizure.  Dr. Cantwell referred Plaintiff to "the prison orthopedist" and ordered an MRI.   The MRI was performed on the same day, and "demonstrated the appearance of a dislocation of the proximal head of the humerus in relation to the glenoid of the scapula, resulting in pseudoarticulation of the glenoid of the scapula with the proximal humerus." (Compl. ¶¶ 38-40.)

Plaintiff saw Defendant Dr. Smith, an orthopedic physician, on the same date, May 14,

---

[1]  On December 23, 2008, the Court issued and sent to Plaintiff the summary judgment notice required by Rand v. Rowland, 154 F.3d 952 (9th Cir. 1998), and Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).  (ECF No. 15.)

2003.  Dr. Smith reviewed the MRI results and diagnosed Plaintiff with a left shoulder dislocation.  Dr. Smith advised Plaintiff that "corrective treatment will be undertaken in about two weeks."  An x-ray was performed on May 28, 2003, which revealed "a left shoulder dislocation, elevated left clavicle secondary to a left acromioclavicular separation."  (Compl. ¶¶ 41, 42.)

Plaintiff was next seen by Dr. Smith on May 30, 2003.  Dr. Smith "performed a closed reduction under general anesthesia in an effort to manually manipulate and re-align Plaintiff's left shoulder dislocation that was demonstrated on the May 28, 2003, radiograph."  (Compl. ¶ 43.)  Plaintiff alleges that Dr. Smith "made no attempt to surgically correct Plaintiff's elevated distal left clavicle, or Plaintiff's left AC joint separation that was clearly demonstrated to exist on the May 28, 2003 radiographic film."  (Compl. ¶ 44.)

On June 11, 2003, Dr. Smith saw Plaintiff for a follow-up visit.  Dr. Smith directed Plaintiff to begin range of motion exercises and physical therapy.  He also prescribed pain medication and extended Plaintiff's "lay-in" from work for ten days.   Plaintiff saw the physical therapist on July 10, 2003.   The therapist referred Plaintiff to the 3B facility physician, who referred Plaintiff to Dr. Smith "for further evaluation of Plaintiff's left shoulder condition as suggested and, in light of, the physical therapist's findings of July 10, 2003."  (Compl. ¶¶ 45-47.)

On July 17, 2003, while exercising on a bicycle in the course of his physical therapy, Plaintiff's left shoulder "popped forward causing Plaintiff to scream out in excruciating pain do to re-dislocating the subject of the left shoulder."  Plaintiff was referred back to Dr. Smith for treatment.  On July 23, 2003, Plaintiff was seen by Dr. Smith.  Dr. Smith noted the dislocation as well as a third degree AC joint separation.  Dr. Smith assessed the joint separation as the "main problem that will need to be repaired."  Dr. Smith indicated that he would refer Plaintiff for a surgical consultation.   (Compl. ¶¶ 48-49.)

Plaintiff continued to experience excruciating pain, "prompting almost daily inquiries to the 3B clinic regarding the status of scheduled surgery which was alleged to have been requested

by defendant."  On August 19, 2003, Plaintiff was advised by the 3B facility physician that he was not on the scheduled surgery list.  On August 31, 2003, Plaintiff submitted a written request that corrective surgery be performed on his left shoulder.  (Compl. ¶¶ 50-53.)

Plaintiff again dislocated his shoulder on October 5, 2003, while taking a shower.  The next day, the 3B facility physician ordered x-rays of the shoulder.  On October 6, 2003, another physician reviewed the x-rays, and "made a medical diagnosis that Plaintiff's left shoulder was not presently dislocated, noted that Plaintiff was scheduled for orthopedic surgery, and advised Plaintiff to take it easy until surgery."  (Compl. ¶¶ 53-54.)

On October 31, 2003, Dr. Smith performed a surgical procedure.  Plaintiff alleges that he did so "without conducting any form of pre-surgery discussion or enlightenment with Plaintiff to apprise what surgical repair of a third degree acromioclavicular joint separation or left shoulder dislocation actually entailed."  Plaintiff alleges that Dr. Smith "executed an unauthorized and unnecessary surgical amputation of the distal end of Plaintiff's left clavicle."   Plaintiff alleges that, as to the procedure itself, Dr. Smith "failed to reduce or surgically correct Plaintiff's clearly demonstrated left shoulder dislocation.  Nor, did defendant Smith, M.D., order to have preoperative or postoperative x-rays taken of Plaintiff's left shoulder or contiguous acromioclavicular joint."  (Compl. ¶¶ 56-58.)   On November 12, 2003, Plaintiff was seen by Dr. Smith for a post-operative evaluation.  Dr. Smith removed the skin staples, noted Plaintiff's chronic shoulder dislocation with associated degenerative changes, and prescribed Tylenol, along with gentle range of motion exercises.  (Compl. ¶ 59.)

On November 19, 2003, Plaintiff dislocated his shoulder while sleeping in his cell.  The next day, Plaintiff was taken to the prison hospital emergency room.  The emergency room physician ordered an x-ray and diagnosed a chronic anterior dislocation.  The doctor requested an emergency referral to the prison orthopedic doctor.  On November 21, 2003, Plaintiff was seen by Dr. Smith.  Plaintiff presented "with a bony protrusion that was plainly visible and appeared to be threatening to erupt from the distal-superior aspect of Plaintiff's left shoulder area."

1   (Compl. ¶¶ 59-61.)  Dr. Smith noted that Plaintiff's distal clavicle "may be a little bit high riding

2   but he cannot be certain as to whether it is or not compared to Plaintiff's post-op status."  Dr.

3   Smith advised Plaintiff that he would "like to observe this condition for the time being."  (Id.)

4          On December 8, 2003, Dr. Smith submitted a referral for Plaintiff to be seen by an

5   outside orthopedic physician."  On January 13, 2004, Plaintiff was seen by  Dr. Amirpour at an

6   outside facility.  Dr. Amirpour noted Plaintiff's medical history, and also noted that the left

7   shoulder dislocation was not reduced.  An x-ray taken the same day indicated chronic

8   anteroinferior dislocation of the left humeral head and resection of the distant clavicle.  Dr.

9   Amirpour diagnosed chronic dislocation of the left shoulder, absorption of the head of the

10  humerus and "deformity over the greater tuberosity and wasting away of the muscles around the

11  shoulder."  Dr. Amirpour ordered a CT scan and an MRI.  (Compl. ¶¶ 62-63.)   The MRI was

12  performed on January 28, 2004, and the CT scan on February 23, 2004. (Compl. ¶¶ 65, 67.)

13         On February 24, 2004, Plaintiff was seen by Dr. Amirpour for a follow-up visit.   Dr.

14  Amirpour offered Plaintiff various treatment options, but concluded that the best treatment

15  option would be excision of the lateral end of the clavicle.  Plaintiff agreed with that course of

16  treatment, and the surgery was scheduled.    (Compl. ¶ 68.)

17         Plaintiff was seen by Dr. Smith on March 3, 2004.  Dr. Smith noted the outside surgeon's

18  recommendation.  Dr. Smith further noted that "he was not sure if the recommended surgery was

19  total shoulder replacement or not, but opined that is what Plaintiff will eventually need."  Dr.

20  Smith prescribed pain medication, and advised Plaintiff to return to the clinic as needed.

21  (Compl. ¶ 69.)[2]

22         Plaintiff was next seen by Dr. Smith on August 4, 2004.  Dr.  Smith noted Plaintiff's

23

24  _____

25         [2]On July 14, 2004, Plaintiff's right shoulder again dislocated.  Plaintiff was taken to the  emergency room at
    Mercy Hospital in Bakersfield.  The physician on duty reduced the dislocation.  On the way back to the prison,
    Plaintiff's shoulder again dislocated.  Upon return to the prison, Plaintiff was taken to the prison emergency room.
26  The physician on duty disagreed that the shoulder was dislocated, but noted Plaintiff's history of chronic shoulder
    dislocation.  The doctor ordered a shoulder sling and muscle relaxers, as well as a referral back to Dr. Amirpour.  On
27  July 16, 2004, an x-ray revealed a dislocation.  (Compl. ¶¶ 71-74.)

28                                                    5

bilateral shoulder dislocations, including "severe degenerative changes" of the left shoulder.  Dr. Smith referred Plaintiff to Dr. Amirpour.  Dr. Amirpour saw Plaintiff on August 10, 2004. Regarding Plaintiff's left shoulder, Dr. Amirpour recommended that it be "evaluated at a tertiary center for definitive treatment."  Dr. Amirpour performed an examination and closed reduction surgery  of the right shoulder under general anesthesia.  (Compl. ¶¶ 76-78.)

Plaintiff experienced episodes of dislocation and subsequent reduction of his shoulders, explaining to medical staff his medical history.  Dr. Smith was not involved in any of these intervening episodes.  (Compl. ¶¶ 79-89.)  Plaintiff was next seen by Dr. Smith on March 2, 2005.  Dr. Smith indicated that Plaintiff needed to be seen by Dr. Amirpour for athroplasty (joint replacement) of the left shoulder, and may possibly need to be transferred to the California Medical Facility since the procedure needs to be done and there are no facilities to do that type of surgery at Corcoran.  (Compl. ¶ 90.)

On May 11, 2006, Plaintiff underwent total shoulder joint replacement surgery for his left shoulder at University Medical Center in Fresno.  (Compl. ¶¶ 107, 113.)  On August 17, 2006, Plaintiff underwent total shoulder joint replacement surgery for his right shoulder at University Medical Center in Fresno.  (Compl. ¶ 115.)

**III.   Defendant's Motion**

      **A.   Summary Judgment Standard**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> a]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

With regard to Plaintiff's motion for summary judgment, as the party with the burden of persuasion at trial, Plaintiff must establish "beyond controversy every essential element of its" his affirmative claims.  S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 888 (9th Cir. 2003) (quoting W. Schwarzer, California Practice Guide: Federal Civil Procedure Before Trial § 14:124-127 (2001)).  The moving party's evidence is judged by the same standard of proof applicable at trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson, 477 U.S. at 248; Nidds v. Schindler Elevator Corp., 113 F.3d 912, 916 (9th Cir. 1996), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Matsushita, 475 U.S. at 588; County of Tuolumne v. Sonora Community Hosp., 263 F.3d 1148, 1154 (9th Cir. 2001).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  Giles v. Gen. Motors Acceptance Corp., 494 F.3d 865, 872 (9th Cir. 2007).  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Rule 56(c).  The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party,  Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

**B.      Eighth Amendment Medical Care**

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'"  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 106,  (1976)).  The two part test for deliberate indifference requires the plaintiff to show (1) "'a serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent."  Jett, 439 F.3d at 1096 (quoting McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal quotations omitted)).  Deliberate indifference is shown by "a purposeful act or failure to respond to a prisoner's pain or possible medical need, and harm caused by the indifference."  Id. (citing McGuckin, 974 F.2d at 1060).  Where a prisoner is alleging a delay in receiving medical treatment, the delay must have led to further harm in order for the prisoner to make a claim of deliberate  indifference to serious medical

1  needs.  McGuckin at 1060 (citing Shapely v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404,

2  407 (9th Cir. 1985)).

3      In order to meet his burden on summary judgment, Dr. Smith must come forward with

4  evidence that establishes the lack of a triable issue of fact.  Dr. Smith's evidence must establish

5  that there is no triable issue of fact as to whether he knew of and disregarded a serious medical

6  need of Plaintiff's, which resulted in injury to Plaintiff.

7      Plaintiff sets out his specific claims regarding Defendant Smith in his complaint as the

8  fourth, fifth, sixth, seventh, eight and ninth causes of action.  The Court will address each claim

9  separately, as well as other specific allegations set forth in the complaint.[3]

10      **Fourth Cause of Action**

11      Plaintiff claims that Dr. Smith failed to provide emergency treatment to Plaintiff's left

12  shoulder dislocation "subsequent to diagnosing said shoulder dislocation on MRI film following

13  examination on May 14, 2003."  (Compl. ¶ 138.)

14      Defendant Smith supports the motion for summary judgment with his own declaration.

15  Dr. Smith, a physician contracted to treat CDCR inmates, declares that he first saw Plaintiff on

16  May 14, 2003, when he saw him at the Acute Care Hospital  at CSP Corcoran.  Plaintiff was

17  referred to Dr. Smith for an orthopedic consult.  Plaintiff was referred for a complaint of left

18  shoulder pain.  Dr. Smith reviewed an MRI that was taken on that date.  The MRI revealed the

19  following: "pseudoarticulation of the glenoid of the scapula, a widened joint space between the

20  glenoid and the scapula, and the scapula and proximal portion of the humerus.  The head of the

21  humerus was not identified, and appeared to have some fractures in the area."  (Smith Decl.¶ ¶

22  2,4.)  Dr. Smith noted that there was not a large amount of fluid in the pseudoarticulation, "which

23  means the pseudoarticulation was a longstanding pre-existing condition of many years."  (Id.)  In

24

25      [3] A verified complaint in a pro se civil rights action may constitute an opposing affidavit for purposes of the
    summary judgment rule, where the complaint is based on an inmate's personal knowledge of admissible evidence,
26  and not merely on the inmate's belief.  McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curiam); Lew
    v. Kona Hospital, 754 F.2d 1420, 1423 (9th Cir. 1985); F.R.C.P. 56(e).  Plaintiff's complaint is signed under penalty
27  of perjury and will therefore be considered an opposing affidavit for purposes of summary judgment.

28                                      9

Dr. Smith's view, if the pseudoarticulation was a recent phenomenon, one would expect much more fluid, evincing a more recent trauma. Dr. Smith also noted that Plaintiff's shoulder muscles had significantly atrophied. Dr. Smith advised Plaintiff that his shoulder separation was chronic, not acute, and he would therefore attempt to correct the dislocation in two weeks. Dr. Smith declares that "I waited because it was my opinion that the dislocation was not acute, but chronic. I felt that there was no significant medical reason or threat to plaintiff's health to wait and get an x-ray to see if a closed reduction versus open reduction made sense. With either procedure it would in any event require a general anesthetic, and that takes time to schedule." (Id.)

The Court finds that Dr. Smith has met his burden on summary judgment regarding Plaintiff's fourth cause of action. Plaintiff claims that Dr. Smith failed to render emergency care. The evidence submitted by Dr. Smith establishes that, in Dr. Smith's professional opinion, an emergency reduction was not warranted. The evidence establishes that the dislocation was chronic and not acute. The evidence also establishes that there was no significant medical reason or threat to Plaintiff's health to delay in order to obtain an x-ray to see if a closed reduction versus an open reduction made sense. The burden now shifts to Plaintiff to come forward with evidence that Dr. Smith's treatment on May 14, 2003, constituted deliberate indifference.

Plaintiff refers the Court to his Exhibit B64 attached to his complaint. Exhibit B64 is a copy of an orthopedic clinic note prepared by Dr. Smith regarding Plaintiff's visit with Dr. Smith on May 28, 2003. During this visit, Dr. Smith reviewed the x-rays taken on May 28th. The x-rays confirmed a posterior dislocation of the left shoulder. Dr. Smith also noted that Plaintiff had a posterior reconstruction in 1988. Dr. Smith noted that Plaintiff "will be going to surgery on Friday for a closed reduction and possible open reduction of this posterior dislocation." (Id.)

Plaintiff has not offered any evidence to support his argument that Dr. Smith's treatment on May 14, 2003, constituted deliberate indifference. It is undisputed that Dr. Smith did not reduce Plaintiff's dislocation on that date. Dr. Smith has, however, come forward with evidence that establishes that the dislocation was chronic, and that it was medically justified to wait two

10

1   weeks to reduce the dislocation under general anesthesia.   The evidence establishes, without

2   dispute, that Dr. Smith treated Plaintiff.  Plaintiff, in his view, should have been treated as having

3   an emergency condition.  Plaintiff cannot prevail in a section 1983 action where only the quality

4   of treatment is subject to dispute.  Sanchez v. Vild, 891 F.2d  240 (9th Cir. 1989).  Mere

5   difference of opinion between a prisoner and prison medical staff as to appropriate medical care

6   does not give rise to a section 1983 claim. Hatton v. Arpaio, 217 F.3d 845 (9th Cir. 2000);

7   Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).  Even if Plaintiff had come forward

8   with evidence that the decision to treat Plaintiff's condition as chronic and not acute was

9   unreasonable, his claim would likewise fail.   "Mere 'indifference,' 'negligence,' or 'medical

10  malpractice' will not support this cause of action." Broughton v. Cutter Laboratories, 622 F.2d

11  458, 460 (9th Cir.1980) (citing Estelle, 429 U.S. at 105-06). See also  Toguchi v. Chung, 391

12  F.3d 1051, 1060 (9th Cir.2004).   There is no evidence that Dr. Smith's treatment of Plaintiff on

13  May 14, 2003, violated the Eighth Amendment.  Judgment should therefore be entered in his

14  favor on this claim.

15  **Fifth Cause of Action**

16      Plaintiff claims that during the course of the surgical reduction of his left shoulder on

17  May 30, 2003, Dr. Smith failed to "treat Plaintiff's left acromioclavicular separation that he knew

18  to exist during the course of performing corrective surgery of Plaintiff's left shoulder

19  dislocation." (Compl. ¶ 143.)

20      Dr. Smith declares that the dislocated glenohumeral joint separation and the AC

21  separation were different and distinct anatomical locations and structures.  The glenohumeral

22  joint was where the chronic dislocations were occurring.  In Dr. Smith's medical opinion,

23  "surgery for closed reduction and possible open reduction of this posterior dislocation at the

24  glenohumeral joint was the appropriate treatment." (Smith Decl.¶ 5.)   The Court finds that Dr.

25  Smith has met his burden on summary judgment regarding the fifth cause of action.  Dr. Smith's

26  declaration states that the reduction of the glenohumeral joint was the appropriate treatment.  On

27

28                                                  11

1   the other hand, the fact that an AC separation also existed does not, of itself, subject Dr. Smith to

2   liability.  Plaintiff must first come forward with evidence that the decision to not reduce both

3   separations at the same time constituted deliberate indifference.  Dr. Smith subsequently repaired

4   the AC joint separation on October 31, 2003.  (Smith Decl. ¶ 9.)

5        Plaintiff refers the Court to Exhibits B64 and B65 to his complaint.  The exhibits indicate

6   that the radiologist, Dr. Centeno, in reviewing the x-rays, indicated that Plaintiff did indeed have

7   an AC separation.   That Plaintiff had an AC separation that was not treated on May 30, 2004,

8   does not, of itself, subject Dr. Smith to liability.  As noted above, Dr. Smith indicated that the

9   condition was chronic, and did not warrant emergency intervention.  Plaintiff's own Exhibits

10   B94 and B95 to his complaint corroborate this view.  Page B94 indicates that, in Dr. Amirpour's

11   view, the condition was chronic.   Although Plaintiff offers evidence that Dr. Smith did not treat

12   the AC separation on May 30, 2003, he fails to offer any evidence that the decision constituted

13   deliberate indifference.  Dr. Smith has come forward with evidence that the treatment he

14   provided on May 30, 2003, the closed reduction of the glenohumeral joint, was a medically

15   appropriate treatment.  Plaintiff disagrees with this view, but offers no evidence to the contrary.

16   Judgment should therefore be entered in Dr. Smith's favor on this claim.

17        **Sixth Cause of Action**

18        Plaintiff claims that he was seen by Dr. Smith after he dislocated his shoulder during a

19   physical therapy session on July 17, 2003. Plaintiff claims that Dr. Smith failed to provide

20   emergency treatment.  (Compl. ¶ 148.)   Dr. Smith declares that he saw Plaintiff on July 23,

21   2003, at the Acute Care Hospital for the injury suffered on July 17th.  Dr. Smith noted Plaintiff's

22   AC separation.  Dr. Smith indicated that the separation would need to be repaired.  Specifically,

23   Dr. Smith declares that he

24        requested that the procedure be scheduled hoping to get this done
          in the near future.  I prescribed Robaxin, a muscle relaxer, for him.

25        I told Plaintiff to return to the clinic in 2-3 months.  He agreed to
          the surgery to fix his AC separation.  I did not try to get the surgery

26        done on an emergency basis because in my opinion his condition
          was chronic.  It did not warrant emergency surgery.

27

28                        12

(Smith Decl. ¶ 8.)

The Court finds that Dr. Smith has met his burden on this claim. As with the claim in the fifth cause of action, Plaintiff argues that Dr. Smith is liable under the Eighth Amendment because he did not treat his condition as an emergency condition. In Dr. Smith's view, Plaintiff's condition was chronic, and did not warrant emergency intervention. The burden again shifts to Plaintiff to come forward with evidence that his treatment on July 23, 2003, constituted deliberate indifference. Plaintiff must do more than argue that his reduction should have been performed on an emergency basis.

Plaintiff refers the Court to Exhibit B70 to the complaint. This exhibit appears to be a memorandum or note regarding the visit with Dr. Smith on July 23, 2003. This record indicates that Plaintiff was suffering from a chronic shoulder dislocation and a third degree AC separation. Dr. Smith noted that the AC separation "is now his main problem. He had an obvious AC separation clinically. This will need to be repaired. I put in a request for this. Hopefully, we can get this done in the near future. I ordered some Robaxin for him. Return to clinic in 2-3 months." This evidence indicates, at most, that Plaintiff was treated by Dr. Smith, and that in his view, Plaintiff's condition could be treated surgically "in the near future." Plaintiff's evidence does not establish, beyond dispute, that Dr. Smith's treatment on July 23, 2003, constituted deliberate indifference. Judgment should therefore be entered in Dr. Smith's favor on this claim.

**Seventh Cause of Action**

Plaintiff claims that Dr. Smith's treatment of Plaintiff on October 31, 2003, constituted deliberate indifference. Specifically, Plaintiff claims that Dr. Smith

> without medical necessity, pre-surgery discussion, or Plaintiff's informed consent, amputated Plaintiff's distal left clavicle and disregarded Plaintiff's left shoulder dislocation during the course of performing an alleged corrective surgical procedure on Plaintiff's left shoulder affliction in an act of unlawful retaliation for Plaintiff submitting a medical appeal demanding immediate

13

corrective surgery of left shoulder dislocation and associated
acromioclavicular separation that had been thus far unduly delayed.

(Compl. ¶ 153.)

Regarding this procedure, Dr. Smith declares the following.

> On October 31, 2003, I was able to successfully surgically repair
> the AC separation on plaintiff's left shoulder under general
> anesthesia at the Acute Care Hospital.  The distal clavicle was
> surgically removed with an oscillating saw.  I drilled two holes in
> the distal clavicle and used these to secure fixation of the clavicle
> to the coracoid process of the scapula.  I removed the distal end of
> the clavicle because this was the standard of care for this
> procedure, and this is the accepted technical method for fixing the
> separation.  I used the above procedure to secure the clavicle
> because it is the standard of care for the procedure.  It is the
> accepted technical method for fixing the separation.  Plaintiff
> tolerated the surgery well and there were no complications.  I was
> proficient with my surgical skills.  I did not remove the distal
> clavicle to cause him harm.  This did not in fact cause him harm.  I
> did it to properly effect the surgical repair of the AC separation
> with the intention of helping plaintiff.  I did not do the surgery to
> retaliate against plaintiff, nor did I attempt to deceive him.  I
> explained the surgery to plaintiff beforehand.  I have done
> hundreds of the same or very similar procedures.  The procedure I
> used is backed up by many clinical outcome and morbidity studies.
> I did not attempt to surgically repair plaintiff's chronic and
> longstanding glenohumeral dislocation condition because there
> were not proper medical equipment and facilities at the Acute Care
> Hospital, and because repair of the AC separation was within the
> capabilities of the facility and more in need of attention at that
> time.  The surgical procedure to repair the AC separation was
> eminently medically necessary and reasonable.  After surgery,
> plaintiff was transported to the recovery room in satisfactory
> condition.

(Smith Decl. ¶ 9.)

The Court finds that Dr. Smith has met his burden on this claim.  Dr. Smith's evidence
establishes that his treatment of Plaintiff on October 31, 2003, was medically necessary, and
conformed with acceptable standards of care.   Although Plaintiff claims that the excision of the
lateral end of the clavicle was done in retaliation for filing an inmate grievance, he comes
forward with no such evidence.   Plaintiff refers the Court to Exhibit B86 to the complaint.  This
exhibit is a record of Plaintiff's consultation with Dr. Amirpour on January 13, 2004.  Dr.
Amirpour references the October 31, 2003, treatment.  Dr. Amirpour's impression follows: "The

patient is suffering from chronic dislocation of the shoulder, absorption of the head of the humerus and deformity over the greater tuberosity and wasting of the muscles around the shoulder." Dr. Amirpour deferred making a final treatment recommendation until he had ordered a CT scan and an MRI. Nothing in Plaintiff's exhibit creates a triable issue of fact as to whether Dr. Smith's treatment on October 31, 2003, constituted deliberate indifference. Plaintiff's complaint, considered as a declaration for purposes of summary judgment, does create a triable issue of fact regarding whether Dr. Smith advised Plaintiff of the details of the procedure. However, whether Plaintiff was advised of the procedure is immaterial. Moreover, Plaintiff has not come forward with any evidence that Dr. Smith was aware of an objectively serious medical condition and disregarded that condition. Judgment should be entered in Dr. Smith's favor in this claim.

**Eighth Cause of Action**

Plaintiff claims that Dr. Smith's decision on November 21, 2003, to classify his referral to an outside orthopedic physician as routine, as opposed to an emergency, constituted deliberate indifference. Dr. Smith declares that he saw Plaintiff at the Acute Care Hospital the day after he had come into the emergency room complaining that something was dislocated in his left shoulder after rolling over in bed. Dr. Smith's diagnosis was that the distal clavicle may have been riding a little bit high but he was not certain at the time. After reviewing the x-rays from the day before, Dr. Smith decided that the best course of action was to observe Plaintiff for changes. Dr. Smith ordered more pain medication and directed Plaintiff to come back on December 8, 2003. (Smith Decl. ¶ 11.)

On December 8, 2003, at the follow-up visit, Dr. Smith noted that Plaintiff still had some discomfort in his shoulder, but it was related to his previous dislocation, not the AC repair. Dr. Smith also "saw again that he had longstanding severe degenerative changes in his glenohumeral joint." In Dr. Smith's opinion, Plaintiff needed a total shoulder replacement. Dr. Smith therefore referred Plaintiff to Bakersfield and ordered more pain medication. Plaintiff was

15

1   directed to return to the clinic in two months.  (Smith Decl. ¶ 12.)

2          The Court finds that Dr. Smith has met his burden on this claim.  In Dr. Smith's

3   professional medical judgment, a routine referral for a total shoulder replacement was the

4   appropriate course of treatment.  Although Plaintiff presented with a dislocation, Dr. Smith noted

5   Plaintiff's history of degenerative changes and chronic dislocations.  Plaintiff disagrees with this

6   decision, but does not come forward with any evidence that Dr. Smith's decision constituted

7   deliberate indifference.  That Plaintiff disagrees with Dr. Smith's chosen course of action does

8   not establish that Dr. Smith was deliberately indifferent to Plaintiff's serious medical need.

9   Judgment should therefore be entered in Dr. Smith's favor on this claim.

10          **Ninth Cause of Action**

11          Plaintiff claims that Dr. Smith failed to " follow-up or ascertain the specifics of an

12   outside orthopedist's orders and recommendations, to whom Plaintiff was referred, for evaluation

13   and treatment of Plaintiff's left shoulder dislocation and acromioclavicular separation."  (Compl.

14   ¶ 165.)

15          Dr. Smith declares that on December 8, 2003, he referred Plaintiff to an outside facility

16   for a total shoulder replacement.  (Smith Decl. ¶ 12.)   Dr. Smith next saw Plaintiff on March 3,

17   2004, when Plaintiff informed him he had been seen by an "outside orthopedist" who had

18   recommended some type of surgery on Plaintiff's left shoulder.  Dr. Smith did not have access to

19   the report by the outside orthopedic physician.  (Smith Decl. ¶ 13.)   Dr. Smith again saw

20   Plaintiff on August 4, 2004, repeated his assessment that Plaintiff needed a total shoulder

21   replacement, and repeated his referral to an outside orthopedic surgeon because Corcoran did not

22   have facilities for shoulder replacement surgery.  (Id.)   Dr. Smith next saw Plaintiff on March 2,

23   2005.  Dr. Smith noted that although Plaintiff had been treated by doctors at Corcoran for both

24   shoulders, he had not yet had shoulder surgery by the outside orthopedic surgeon.  Dr. Smith also

25   noted that his physician had ordered an  appointment with an outside orthopedic physician that

26   was scheduled for April 16, 2005.  Dr. Smith further noted that Plaintiff needed to be possibly

27

28                                                    16

transferred to another CDCR facility that could provide shoulder replacement surgery.  (Smith Decl. ¶ 14.)

Dr. Smith has no role in, nor responsibility for, receiving and putting into prison medical files those records created by outside health care providers.  Dr. Smith does not have any responsibility for maintaining prison medical files.  Dr. Smith never received treatment records on Plaintiff from any outside doctor or source other than what was already placed in the medical file by others.  Dr. Smith never removed any item out of Plaintiff's medical file for any reason.  (Smith Decl. ¶ 15.)   Other than requesting that inmates be scheduled for an outside consultation, Dr. Smith is not involved in the actual scheduling.  Dr. Smith's practice with all his inmate patients is to make the referral.  Once the referral is made, the scheduling of surgeries is accomplished by prison staff.  Dr. Smith has no role in the medical scheduling.  (Smith Decl. ¶ 17.)

Plaintiff's own exhibits indicate that he was aware of the need to follow up with the outside orthopedic physician.  Exhibit B84 to the complaint is the inmate copy of the Health Care Service Request form for the referral Dr. Smith made on December 8, 2003, and approved on December 15, 2003.   Exhibit B91 is a copy of a letter written by Plaintiff on February 17, 2004, and addressed to the Health Care Manager at CSP Corcoran.  The letter expressed Plaintiff's concerns regarding a delay, and requested that Dr. Smith's orders be executed.  Plaintiff also submitted a Health Care Services Request Form on May 14, 2004, requesting further follow up with the outside orthopedic physician.  (Pltf.'s Exh. B98-99.)  Plaintiff articulates that he knew he had to follow up with the outside physician, that Dr. Smith's surgery in October of 2003 was only able to address his AC separation, and that further surgery had to be done outside of Corcoran.  (Id.)  Dr. Smith declares that "my review of the records show he was timely followed by the outside orthopedist for treatment options.  The presence or absence of the reports in the prison medical file made no difference to that."  (Smith Decl. ¶ 16.)

Dr. Smith specifically declares that he never intentionally or deliberately delayed

17

1    providing plaintiff medical care and/or treatment.   In Dr. Smith's view, the timing of Plaintiff's

2    care and treatment was reasonable.   Dr. Smith was never presented with an emergency regarding

3    Plaintiff's shoulder during the course of Plaintiff's care.   (Smith Decl. ¶¶ 17-18.)

4           The Court finds that Dr. Smith has met his burden on this claim.   The evidence submitted

5    by Dr. Smith establishes, without dispute, that he was not responsible for any delay in Plaintiff's

6    referral to an outside physician.   The evidence also establishes that Dr. Smith responded to

7    Plaintiff's condition by referring him to an outside physician.   Dr. Smith is a contract physician

8    with the CDCR, and is not responsible for the scheduling of appointments.   Plaintiff fails to

9    come forward with any evidence that Dr. Smith was responsible for any delay in his outside

10   treatment.   The evidence establishes that there were many people involved in Plaintiff's care, and

11   that Dr. Smith responded appropriately to Plaintiff each time he presented to Dr. Smith.   Plaintiff

12   fails to come forward with any evidence that Dr. Smith was responsible for the scheduling of

13   Plaintiff, or interfered in any way with Plaintiff's outside treatment.   Judgment should therefore

14   be entered in Dr. Smith's favor on this claim.

15   **June 11, 2003, Appointment**

16          Although Plaintiff fails to make any specific claims in his statement of claims regarding

17   the June 11, 2003, appointment with Dr. Smith, Plaintiff does allege that he was seen on June 11,

18   2003, by Dr. Smith for a follow up visit (after the closed reduction performed by Dr. Smith on

19   May 30, 2003).   Plaintiff alleges that Dr. Smith directed Plaintiff to begin range of motion

20   exercises and physical therapy.   He also prescribed pain medication and extended Plaintiff's "lay-

21   in" from work for ten days.   Plaintiff saw the physical therapist on July 10, 2003.   (Compl. ¶¶

22   45-47.)

23          In support of his motion for summary judgment Dr. Smith declares that, as alleged, he did

24   advise Plaintiff to begin range of motion exercises.   Dr. Smith also ordered physical therapy and

25   pain medication for Plaintiff, and extended his lay-in from work another 10 days.   Dr. Smith told

26   Plaintiff to return in six to eight weeks for another follow up.   Dr. Smith prescribed the above

27

28                                                    18

1  care "because it was basic protocol and standard of care for a post reduction treatment plan."

2  (Smith Decl. ¶ 7.)

3      The Court finds that Dr. Smith has submitted evidence that his treatment of Plaintiff on

4  June 11, 2003, was reasonable and comported with appropriate medical standards.  The evidence

5  establishes the lack of existence of a triable issue of fact.  Plaintiff fails to come forward with any

6  evidence that establishes a triable issue of fact as to whether Dr. Smith's treatment of Plaintiff on

7  June 11, 2003, constituted deliberate indifference as that term is defined above.  Plaintiff offers

8  no evidence that on June 11, 2003, Dr. Smith knew of and disregarded a serious medical need of

9  Plaintiff's.  Dr. Smith is therefore entitled to judgment on this claim.

10  **IV.    Conclusion and Recommendation**

11      Dr. Smith has come forward with evidence that, every time that Plaintiff presented to

12  him, Dr. Smith treated Plaintiff with appropriate medical care, and prescribed treatment in

13  accordance with acceptable medical standards.  The gravamen of Plaintiff's claim is that his

14  shoulder separation should have been treated as an emergency condition.  Plaintiff offers no

15  evidence that he ever presented to Dr. Smith with an emergency condition.  Plaintiff's own

16  exhibits indicate a repeated assessment that his condition was chronic.  The law on this matter is

17  clear.  Plaintiff cannot prevail in a section 1983 action where only the quality of treatment is

18  subject to dispute.  Sanchez v. Vild, 891 F.2d  240 (9th Cir. 1989).  Mere difference of opinion

19  between a prisoner and prison medical staff as to appropriate medical care does not give rise to a

20  section 1983 claim. Hatton v. Arpaio, 217 F.3d 845 (9th Cir. 2000);  Franklin v. Oregon, 662 F.2d

21  1337, 1344 (9th Cir. 1981).   Plaintiff also contends that Dr. Smith is responsible for delays in

22  Plaintiff's ultimate treatment by an outside physician.  Plaintiff offers no evidence that Dr. Smith,

23  a contract physician, was responsible for patient scheduling, or in any way interfered with or

24  intentionally delayed Plaintiff's ultimate treatment by outside physicians.  Dr. Smith is therefore

25  entitled to judgment as a matter of law.

26      Accordingly, IT IS HEREBY RECOMMENDED that Defendant Dr. Smith's motion for

27

28                                              19

1  summary judgment be granted, and judgment be entered in favor of Dr. Smith and against

2  Plaintiff.

3        These findings and recommendations are submitted to the United States District Judge

4  assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).  Within thirty days

5  after being served with these findings and recommendations, any party may file written

6  objections with the court and serve a copy on all parties.  Such a document should be captioned

7  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

8  shall be served and filed within ten days after service of the objections.   The parties are advised

9  that failure to file objections within the specified time waives all objections to the judge's

10  findings of fact.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998).  Failure to file

11  objections within the specified time may waive the right to appeal the District Court's order.

12  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

13

14

15       IT IS SO ORDERED.

16  **Dated:**   **February 15, 2011**            _____ **/s/ Gary S. Austin** _____

17                                           UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26

27

28                              20